**Pages 1 - 19**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable James Donato, Judge

| | |
|---|---|
| YANBIN YU, et al.,      ) | |
|          ) | |
|       Plaintiffs,   ) | |
|          ) | |
|   VS.        ) | **NO. C 18-06181 JD** |
|          ) | |
| APPLE INC.,      ) | |
|          ) | |
|       Defendant.   ) | |
|          ) | |
| YANBIN YU, et al.,       | |
|          ) | |
|       Plaintiffs,   ) | |
|          ) | |
|   VS.        ) | **NO. C 18-06339 JD** |
|          ) | |
| SAMSUNG ELECTRONICS CO., LTD,  ) | |
| et al.,      ) | |
|          ) | |
|       Defendants.   ) | |
|          ) | |

San Francisco, California
Thursday, June 13, 2019

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:

       DAN JOHNSON LAW GROUP LLP
       400 Oyster Point Blvd., Suite 321
       South San Francisco, CA  94080
   **BY:  ROBERT G. LITTS, ATTORNEY AT LAW**
      **DANIEL JOHNSON, JR., ATTORNEY AT LAW**

(Appearances continued on the following page)

Reported By:     Marla F. Knox, RPR, CRR
         Official Reporter

**APPEARANCES: (cont'd)**

For Defendant Samsung:

        ROPES AND GRAY LLP
        1900 University Ave., 6th Floor
        Palo Alto, California  94303
  BY:  **JAMES R. BATCHELDER, ATTORNEY AT LAW**
      **SCOTT S. TAYLOR, ATTORNEY AT LAW**


For Defendant Apple:

        COOLEY LLP
        3175 Hanover Street
        Palo Alto, California  94304
  BY:  **DENA CHEN, ATTORNEY AT LAW**
      **LOWELL D. MEAD, ATTORNEY AT LAW**

**Thursday - June 13, 2019**                    **11:38 a.m.**

### P R O C E E D I N G S

---000---

THE CLERK:  Calling related action Civil 18-6181, Yu versus Apple and Civil 18-6339, Yu, et al. versus Samsung.

Counsel, please come forward to state your appearances for the record.

MS. CHEN:  Good morning, I'm Dena Chen for Defendant Apple and with me is Lowell Mead and our client is in the gallery.

MR. BATCHELDER:  Good morning, Your Honor, for the two Samsung Defendants, Jim Batchelder with Ropes and Gray, and with me is my colleague Scott Taylor.

THE COURT:  All right.  Welcome, Everyone.

MR. LITTS:  Good morning, Your Honor, Robert Litts of Dan Johnson Law Group for Plaintiffs Yu and Zhang, and with me is my partner Dan Johnson.

THE COURT:  All right.  Okay.  *Alice*, who would like to take the lead?

MS. CHEN:  I will take the lead.

THE COURT:  Okay.  Go ahead.

MS. CHEN:  Defendants' motion to dismiss under Section 101 should be granted for two simple reasons.  First, the Federal Circuit's decisions in *In Re:  TLI* and the recent *Chargepoint versus SemaConnect* decisions are directly on point.

Both decisions dealt with apparatus claims found invalid on motions to dismiss.  Both Federal Circuit decisions illustrate that merely reciting conventional components for their ordinary usage cannot transform claims into patentable subject matter.

Here, we know the claims are directed to a broad abstract idea because Plaintiffs' own complaint at paragraphs 11 and 12 allege that virtually all dual lens cameras on the market today use the techniques claimed in the 289 patent.

Plaintiffs' complaint further alleges that the claimed invention is not limited to performing any particular type of image enhancement.

In fact, just like in two-way media, the claims here never teach us how to enhance an image.  They are simply directed to the abstract idea of image enhancement.

**THE COURT:**  Now, let me ask you a question about that.  So with *Alice*, I always like to start with the patents.  So I read the specifications in the claims.  And let's say that that description is right.  It is sort of the idea -- the principle -- the ultimate principle is enhancing an image by combining lenses.  Now, you all kind of -- you had a little brain -- you had a human brain --

**MS. CHEN:**  Analogy.

**THE COURT:**  Yes.

**MS. CHEN:**  Right.

**THE COURT:**  But with -- I was thinking -- and we will hear from the Plaintiffs about this, of course, too -- you know, in just the photography world, it is not -- it seems like it has kind of been a thing for a long time -- certainly well before the date of the patent -- to use multiple lenses and multiple images to get a better picture.

So I was wondering why you didn't -- rather than doing a physiological process, is there some reason you don't like the camera analogy?

**MS. CHEN:**  No.  I think Your Honor is exactly correct. Black and white photography has existed for ages, well before these -- this patent in this case.

**THE COURT:**  But I would just -- I just wanted to make sure that there was not some reason not to understand the patent with that maybe as an analogy.  There is no reason not to do that.

**MS. CHEN:**  No.  I think that analogy works as well.

**THE COURT:**  Sorry.  Mr. Litts?

**MR. LITTS:**  Yes.

**THE COURT:**  So, you know, you heard what I said.  So the idea of using multiple lenses and multiple images has kind of been around for a long time.  And this is sort of the classic -- it looked to me, and you can tell me why you disagree -- this looks like the classic Oh, we will reduce this to the digital world.  Of course, that is not enough for *Alice*.

It is not enough for eligibility, I should say.

MR. LITTS:  Sure.  Well, there is a little bit more to the patent claims and the specification in the file history than I think Apple and Samsung led on.

The claims are not directed to just a multi-sensor and multi-lens camera but to a specific configuration of those image sensors and those lenses.

THE COURT:  Can you just show me -- well, where is that in the patent?

MR. LITTS:  Well, that is in Claim 1.  So it recites not just first and second image sensors but also that they are closely positioned with respect to the common plane.  And also constructive Claim 1, the second image sensor must be responsive to a full region of visible color spectrum; and that limitation is also incorporated with respect to the first image sensor in Claim 2.

THE COURT:  Well, let me just -- I like to look at the figures because they often help me understand the patents.  So I have been looking at Figure 8 and -- you know, it is a pretty -- pretty clean statement that the claimed invention is using multiple lenses with multiple sensors to produce an enhanced image.  And that does -- that is something that photographers have been doing a long time pre-digital world, just in the optical world so --

MR. LITTS:  I think it is worth pointing out in the

file history, when the claims that are asserted in this case were allowed, they weren't allowed because of any image processing that is taking place in the claim.  They are actually allowed on the first office action because of the qualities of the image sensors.

So it wasn't the image processing.  It was the organization of the image sensors and the type of image sensors specifically that with regard to Claim 1, that the references didn't disclose that configuration in which one of the sensors was responsible to a full region of visible color spectrum.  So that was in the claim.

That was the reason why the claims were allowed in the first place not because of image processing.

THE COURT:  All right.  Ms. Chen, what do you think about that?

MS. CHEN:  So if we look at Mead Exhibit A, pages 2 to 3, Docket No. 44-1, which is the file history, that was submitted in the record, the examiner found that the same configuration of sensors, lens, common plane, processor, memory, that same configuration was known more than 15 years before the 289 patent.

Examiner found the Nagumo patent, which is Exhibit B, a Sony patent, that had the same configuration --

THE COURT:  That is kind of a prior art deal, though. I mean, we are in *Alice*-land.  We are talking about eligibility

and is this just something that has been around forever and are they just reducing it to a new, you know, platform.  How about a little more on that?

I mean, so your colleague is saying, Oh, no, it is not just multiple lenses and multiple images.  It is a very special arrangement, and that's the plus factor.  That is the inventive part.

MS. CHEN:  Right.  And so the reason why it is not an inventive concept sufficient to transform the claims into patentable subject matter is because the same configuration was known.  This is unlike *Thales* and *Electronic Scripting* where you have a unique, unconventional use of inertial sensors, a unique specific configuration that was never used before and a specific method of looking at raw data and using the sensors.

This is not like those cases.  This is a case where you use off-the-shelf conventional lens sensor, no configuration and just simply having the abstract idea of image enhancement.

MR. BATCHELDER:  Your Honor, if I can add a point?

THE COURT:  Yes, please.

MR. BATCHELDER:  In terms of the configuration, I mean, the claim in the last limitation speaks to the abstract idea.  Very clearly says producing a result in image --

THE COURT:  Which paragraph?

MR. BATCHELDER:  I'm sorry.  This is Claim 1, the final limitation.

THE COURT:  Okay.  All right.

MR. BATCHELDER:  So it begins with a digital image processor and describes what it does.  At the end there it says, after the last comma, producing a result in digital image from said first digital image enhanced with said second digital image.  That is the abstract idea basically, using one image to enhance another.

Everything else in this claim is the conventional guts of a digital camera.  There are image sensors that take in light.  All digital cameras have those.  In front of those are lenses.  All digital cameras have those.  The sensor feeds its image to an ADD converter.  Of course, you have those to make it digital.  That image then gets processed.  Of course, you have a processor; and there is a memory to store the processed image.  That's all it is.

And the configuration that is claimed simply lays out that those connections with lenses in front of sensors coupled with ADD converters that feed into processors in the memory.

THE COURT:  That is kind of what Figure 8 is saying too.

MR. BATCHELDER:  Exactly.  So there is nothing special or unconventional -- certainly not inventive -- under *Alice* step 2 about the configuration here.  This is all just the conventional stuff of a digital camera.

So all these limitations do is confine it to a field of

use; but as the cases have made very clear -- and we cited the *Affinity Labs* case in our briefing; Your Honor's *IPLearn* case also made the same point -- a field-of-use restriction is not enough to salvage a claim from ineligibility.

**THE COURT:** Mr. Litts?

**MR. LITTS:** I have a little difficulty seeing how these are field-of-use restrictions. These are specific configurations of specific components.

Two points I want to make. Opposing Counsel keeps mentioning this is a conventional arrangement. This is in every digital camera, but what they are saying is just belied by the record. That is not why the patent examiner allowed the claims. The patent examiner obviously didn't agree with what Samsung and Apple are arguing. The reasons for allowance -- like just I said -- of the asserted claims in this case have nothing to do with image processing. They have to do with the arrangement and type of components, the sensors and the lenses.

**THE COURT:** Okay.

**MR. LITTS:** So that does constitute an inventive concept. A non-generic and a non-conventional arrangement of components constitutes an inventive concept, and that is under Prong 2.

Another point I want to bring up is that Apple and Samsung or Samsung has not mentioned or not spoken at length about Prong 1 of the *Alice* test.

So under Prong 1, if the invention improves the functionality or the capabilities of some device, then it is not, quote-unquote, directed to an abstract idea even if it arguably incorporates one.  So here --

**THE COURT:**  Well, let me -- image processing is clearly an abstract idea.  Are you saying it is not an abstract idea?

**MR. LITTS:**  No.  What I'm saying is that the claims aren't directed to that.  The claims are directed to the arrangement and the type of image sensors and lenses; and that arrangement and that type of image sensor, that is what allows the image processing to take place.

**THE COURT:**  But that makes sense only because it is directed to producing a better picture, the abstract concept of improving a picture.  I mean, the arrangement of lenses nobody cares about if it is not in service to the goal of getting a good image, right?

**MR. LITTS:**  Well, put it another way, it is the arrangement of the lenses and sensors that facilitates it. That is why the image enhancement happens because you are taking multiple -- capturing multiple images from the sensor to the same image target and then enhancing one with the other.

It is the existence -- the arrangement and the use of the two image sensors in that particular configuration that is what allows the image enhancement to happen, and that is repeated

throughout the specification as an advantage over of multi-sensor and multi-lens cameras over the prior single camera -- prior single --

THE COURT:  I understand.

MR. LITTS:   Sensor and lens cameras.  So the patent owner -- the patentees specifically said that repeatedly; that this advantage is brought about by the existence of the multiple image sensors and the multiple lenses.

THE COURT:  Ms. Chen, last words?

MS. CHEN:  Yes.  First to respond about the alleged unique configuration, we actually look at what the examiner said on page 4 of Mead Exhibit A, Docket 44-1.  The examiner doesn't talk about a unique configuration.  Plaintiff is just making this argument.  Examiner talks about having --

THE COURT:  What page was that?

MS. CHEN:  Page 4.

THE COURT:  Okay.

MS. CHEN:  -- that allowable subject matter.  If we look at that second sentence in paragraph 8, there is nothing about a configuration here.  The reason the claims were allowed was having a sensor that was sensitive to a full visible color spectrum.

So it is not about configuration because that same configuration was found and known well before the 289 patent. They are talking about full visible color spectrum just like

eyes, just like black and white cameras.  There is nothing inventive about these claims.

The second point is that Plaintiffs talk about an alleged arrangement that facilitates the camera.  This is why *In Re: TLI* is directly on point.  It is the same concept as *In Re: TLI*.  When you have conventional components that are usually just to put in a generic camera environment to facilitate the abstract idea, that is not enough under *Alice*.

THE COURT:  Okay.

MR. BATCHELDER:  Your Honor, if I could just add.

THE COURT:  Yes, please.

MR. BATCHELDER:  Two last points.  One is I'm sure Your Honor noticed that these claims were allowed before *Alice*. So the fact that they were allowed because -- for the reasons cited by Ms. Chen is unremarkable and doesn't really speak to this issue.

As to the abstractus of the idea, though, Your Honor points out that digital cameras have had multiple lenses for a long time.  The brain analogy is compelling because the case law does make clear that ordinary mental processes are abstract.

THE COURT:  Well, no, I agree.  But we don't use multiple lenses.  We don't take -- I mean, we have two lenses, but they are physiologically supposed to be -- I just thought the camera -- the past practice of camera photography was maybe

more apt; but I'm not rejecting it.  I'm just -- it was easier for me to think about it in terms of --

MR. BATCHELDER:  I would say they are each independent reasons to conclude that the claims are abstract.  On the brain analogy, we do have two lenses.  We put the picture of the bowling pins in our brief on page 4.  You have a left eye taking one image and the right eye taking another.  You take the brain, the mind every time our eyes are open.  It takes those two images and makes a better image -- a single one with them.  That's all these claims are directed to.

The *Electric Power Group* case we cited does describe ordinary mental processes as abstract ideas that are precluded from Section 101.  The same is true here.  We cited that they didn't try to distinguish that.

THE COURT:  Thank you.  Let's just talk briefly about willful infringement.

MR. LITTS:  I had a couple quick points.

THE COURT:  Please.  Then we have to move on.

MR. LITTS:  Oh, sure.  With regard to the file history, I just wanted to recite explicitly what the examiner said.  Claim 1, 2 and 425 are allowed.

THE COURT:  You are talking about page --

MR. LITTS:  This is page 4.

THE COURT:  On Docket 44-1.  I have it right here.

MR. LITTS:  The following is a statement of reasons

for the indication of allowable subject matter:  Prior art discloses image pickup devices compromising --

**THE COURT:**  You are going to kill the court reporter.

**MR. LITTS:**  I apologize.  Prior art discloses image pickup devices compromising of up to four image sensors but is silent on the issue of one of said two or four image sensors being sensitive to a full visible color spectrum in combination with other limitations within Claims 1 and 6.

So I think that we have presented a rather accurate explanation of what happened in the file history.  The reasons for allowance have nothing to do with image processing.  It has to do with the components of the camera.

And one final point -- actually, two final points.  With regard to inventive concept, that looks into what is -- what would be a conventional or generic arrangement of components in the digital camera; not a generic or conventional arrangement of human body parts.  That is entirely unrelated to this analysis.

Whenever the courts get into this discussion of sort of comparing claims to some sort of human physiological process, it is in the context of mental steps, not in the context of anatomical features like this.  There is absolutely no support whatsoever for this analogy.  So this should be rejected.

**THE COURT:**  Thank you.  So I may not have to reach this depending on how the eligibility question goes, but is

there anything you want to add, Ms. Chen or Mr. Batchelder, on willful infringement, keeping in mind that just a scant few months ago I made it clear that I do think it is willful infringement.  It is an intensely factual requirement as inquiry.  I'm very reluctant to turn it off at the pleading stage -- I mean, who knows what happens when we get discovery -- but typically if a Plaintiff alleges that the Defendant knew about the patent and continued to engage in allegedly infringing activity, I think that's enough as a plausible threshold for pleading purposes; and the rest of it is going to be all fact based.  Who represents Apple?

**MS. CHEN:**  I represent Apple.

**THE COURT:**  So presumably you know about First Face but --

**MR. BATCHELDER:**  For Samsung Scott Taylor will address this.

**THE COURT:**  All right.

**MR. TAYLOR:**  Good morning, Your Honor, Scott Taylor on behalf of Samsung and with me is Lowell Mead on behalf of Apple.

**THE COURT:**  Okay.  Can you speak up just a little bit or move that closer?

**MR. TAYLOR:**  Sorry, Your Honor.

**THE COURT:**  That's fine.

**MR. TAYLOR:**  I think perhaps what Your Honor would

like to hear most is the factual --

THE COURT:  I was right, that's what I want to hear most.

(Laughter)

MR. TAYLOR:  Now, with respect to at least Samsung Defendants --

THE COURT:  You are not going to say that, okay.

(Laughter)

MR. TAYLOR:  -- the issue that we are speaking to is willfulness being a factual inquiry.  The, I think, major deficiency with Plaintiffs' case here is that the purported knowledge of the 289 patent is directed at Samsung Electromechanics which Plaintiffs allege and we don't necessarily dispute is an affiliate of Samsung.

The problem here is that these are two separate legal entities, and Plaintiffs make the jump from Samsung Electromechanics' purported knowledge through a citation  with a patent application that they had submitted and just they automatically impute that.

THE COURT:  Let me -- so for Samsung I looked at page -- I'm looking at the complaint, Docket No. 1.

MR. TAYLOR:  Paragraphs 27 through --

THE COURT:  That might be it.  Let's see.  It might have been 17.  Well, okay.  So which one did you say?

MR. TAYLOR:  I'm referring to paragraphs 27 through

29, Your Honor, under the heading Samsung's knowledge of the 289 patent.

THE COURT:  Oh, yes, you are saying that is a different entity?

MR. TAYLOR:  Yes.  Right in paragraph 27 Plaintiffs make reference to Samsung Electromechanics --

THE COURT:  Yes.

MR. TAYLOR:  -- or SEM as an affiliate of SEC.  It was SEM's patent application.

THE COURT:  So it was SEM that had the patent application?

MR. TAYLOR:  Correct, Your Honor.  And they cited to the 289 patent.

THE COURT:  Right, but you are saying --

MR. TAYLOR:  SEM is a different legal entity than SEC, and it is not a Defendant in this lawsuit; and there are no factual allegations that would support imputing any knowledge that SEM might have had to SEC.

THE COURT:  Mr. Litts?

MR. LITTS:  Well, it is true that they are separate legal entities.  But it is a little bit difficult to -- it is impossible to know at this point what the relationship is between these two companies or to what extent these individuals from SEM are working with individuals from SEC on any product development or anything like that.  We simply need discovery on

that.  So it is a little bit difficult to believe in a company like this that there would be no overlap in work.

**THE COURT:**  All right.  I will tell you what, I'm running a little bit late and it is already noon.  I'm glad you mentioned that.  Is it Mr. Taylor?

**MR. TAYLOR:**  Yes, Your Honor.

**THE COURT:**  So I will give it a closer look but we will see, okay.  Anything else to add on willfulness by either side?  No.  Good.  I will have this out when I can.  All right.  Thank you.

**MR. LITTS:**  Thank you.

**MR. TAYLOR:**  Thank you, Your Honor.

(Proceedings adjourned at 12:01 p.m.)

---oOo---

## CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:    Wednesday, July 3, 2019

_____

Marla F. Knox, RPR, CRR
U.S. Court Reporter